FERRIS and another, *appellants, vs.* CRAWFORD and another, *respondents.*

Where a mortgagor sells the mortgaged premises subject to the mortgage, and the amount of the mortgage debt is deducted from the price, the purchaser is bound in equity to pay off the mortgage. *Per* BRONSON, C. J.

And a grantee of such purchaser takes the premises subject to the same obligation. *Per* BRONSON, C. J.

Where a debtor mortgages lands to his creditor and also transfers to him collateral securities for the same debt, and then sells the land subject to the mortgage, deducting its full amount from the price, and the mortgagee realizes a portion of the mortgage debt from the collateral securities; the mortgaged premises, in equity, remain chargeable in the hands of the purchaser with the whole amount of the original mortgage debt: and the incumbrance to the extent of the balance due the mortgagee is for his benefit, and as to the amount realized upon the collateral securities it is for the benefit of the mortgagor.

And where in such a case a decree of foreclosure at the suit of the mortgagee adjusts the equities of the parties upon the principles above stated, the complainant is not authorized upon receiving the amount payable to him to consent to the discontinuance of the suit while the sum payable to the mortgagor remains unpaid. *Semble.*

A release by a party to a suit may be set aside or cancelled, for fraud, on a motion made in the cause, without awarding an issue to try its validity.

And where a motion to set aside proceedings in a suit in chancery was founded on a release executed by the opposite party, and was opposed on the ground that the release was obtained by fraudulent representations; *held* that the court could determine the question of fraud without the intervention of a jury.

A denial of the motion on account of fraud in obtaining the release does not operate to set it aside, but leaves the releasee at liberty to rely upon it in other proceedings.

ON appeal from a decree of the court of chancery, reversing an order of the vice chancellor of the first circuit. The suit, in which the motion was made, out of which this appeal arose, was *Archibald Watt v. James Crawford, administrator de bonis non of William Crawford, deceased, and James Ferris Jr.* It was instituted before the vice chancellor of the first circuit for the foreclosure of a mortgage, executed by W. Crawford in his lifetime, to the complainant; and Ferris was made a defendant as the owner of the equity of redemption. James Oakley was the first administrator of the mortgagor, and was originally a defendant. He died pending the suit before the vice chancellor,

and it was revived against James Crawford, as administrator *de bonis non*. The assistant vice chancellor had made a decree of foreclosure, which directed that out of the proceeds of the sale of the mortgaged premises $1065,83 should be paid to the complainant, together with his costs, and $4396,05 to the defendant, J. Crawford, as administrator &c., if the premises should sell for sufficient to make such payments, and if not, that the balance after the paying the complainant should be paid to the administrator—the remainder of the proceeds, if any, to be brought into court. From this decree both defendants appealed to the chancellor. Pending that appeal Ferris paid the amount due the complainant with interest and the costs of suit, to his solicitor; and the solicitors for both parties signed a stipulation that the bill be dismissed as to the complainant without costs. Shortly afterwards, the defendant Crawford, as administrator of W. Crawford, executed to Ferris a release of his interest in the decree, discharging the premises therefrom, and from the mortgage. The release stated that it was given in consideration that Ferris "had agreed and undertaken to pay and discharge all the just debts against the estate of the said William Crawford, deceased." These papers were executed in January, 1841. In Nov. 1843, the defendant Crawford finding, as he supposed, that he had been fraudulently deceived into the execution of the release, procured the complainant to prosecute the appeal; and in May, 1844, the decree of the assistant vice chancellor was affirmed by default. The defendant Crawford then procured the mortgaged premises to be sold pursuant to the decree, and became the purchaser at $3000. The defendant Ferris, and Claiborne Ferris, then moved the vice chancellor, upon affidavits shewing the above mentioned stipulation and release, and that C. Ferris had become interested in the premises, by having taken an assignment of a mortgage executed upon a sale thereof made by the defendant Ferris to F. T. Ferris, in January, 1839, for an order setting aside all the proceedings in the cause subsequent to the stipulation to dismiss &c. Affidavits and papers on behalf of the complainant and of the defendant Crawford, were read in opposition. The facts disclosed in these papers are

Ferris v. Crawford.

stated in the opinion delivered by the chief justice. The vice chancellor, in November, 1844, made an order authorizing the filing of the stipulation dismissing the bill as against the complainant—setting aside the master's sale and subsequent proceedings, and declaring the same void, and directing the defendant Crawford to pay the costs of the application, without prejudice, however, to his right to file a bill to set aside the release.

Crawford appealed to the chancellor, who reversed the order of the vice chancellor and ordered the motion to be dismissed with costs, and directed the proceedings to be remitted &c., whereupon J. & C. Ferris appealed to this court.

*J. T. Brady*, for the appellants, among other points insisted that the release could not be impeached on a motion, but only by the verdict of a jury upon an issue. (*Russell* v. *Packard*, 9 *Wend.* 431; *Reed* v. *Gordon*, 1 *Cow.* 50; *Harrod* v. *Benton*, 8 *Barn. & C.* 217; *Apthorp* v. *Comstock*, 2 *Paige*, 482; *Seymour* v. *Delancey*, 1 *Hopk.* 436; 5 *Cow.* 714, *S. C.*)

*H. F. Clark & E. Sandford*, for the respondents, referred to the following authorities to show that the release might be invalidated for fraud, without awarding an issue. (*Harrod* v. *Benton, cited sup.; Furnival* v. *Weston*, 7 *J. B. Moore*, 356; *Manning* v. *Cox, id.* 617; *Legh* v. *Legh*, 1 *Bos. & Pul.* 447; *Innel* v. *Newman*, 4 *Barn. & Ald.* 419; *Arton* v. *Booth*, 4 *J. B. Moore*, 192; *Mountstephen* v. *Brooke*, 1 *Chitty's R.* 390; *Jones* v. *Herbert*, 7 *Taunt.* 421; *Crook* v. *Stephen*, 5 *Bing. N. C.* 688; *Johnson* v. *Holdsworth*, 4 *Dowl.* 63; *Cooling* v. *Noyes*, 6 *T. R.* 263; *Timan* v. *Leland*, 6 *Hill*, 237; 1 *Young & Jervis*, 365; *Fullagar* v. *Clark*, 18 *Ves.* 481.) And to show that the release of an administrator was void, they cited the following cases. (*Gram* v. *Cadwell*, 5 *Cow.* 489; 1 *McLean's R.* 197; *Beardman* v. *Halliday*, 10 *Paige*, 223; *Champlin* v. *Haight, id.* 274; *McLeod* v. *Drummond*, 17 *Ves.* 153 *to* 167; 2 *Vern.* 616; 2 *Bro. Ch.* 476; 3 *J. J. Marshall*, 614 *to* 621; 5 *Monroe's Rep.* 529; 7 *Conn.* 57 *and the cases cited*; 2 *Gill & J.* 208; 3 *Pick.* 211; *Shackell* v. *Rosier*, 2 *Bing. N. C.* 634.)

BRONSON, Ch. J.   The motion which has given rise to this appeal was made by the appellants in a foreclosure suit commenced in 1835, by Archibald Watt, complainant, against James Oakley, administrator of William Crawford, the mortgagor, and James Ferris, who had purchased the equity of redemption at a sheriff's sale.   On the death of Oakley in February, 1839, James Crawford, administrator *de bonis non* of William Crawford, was substituted as a defendant in the place of Oakley.   While such was the state of parties, the appellants made their motion in November, 1844—one of them not being a party to the suit, and the other having conveyed all his interest to Floyd T. Ferris in 1839, and having, as he testified, no interest of any nature or kind in the property.   We then have a motion by one who was not a party to the suit, and another who had no interest; and to make the case still more striking, Floyd T. Ferris, to whom the equity of redemption had been conveyed, was not in any way made a party to the proceeding.   I am inclined to think the motion might well have been denied on the ground that the appellants were not in a condition to make it.   But I will not stop further to consider that question; for assuming that the motion was made by proper parties, there was abundant ground for denying it on the merits.

In April, 1830, Crawford, the intestate, was indebted to Watt, the complainant, in the sum of $4500.   He executed a mortgage to Watt to secure the payment of $3000 of the debt; and he placed in the hands of Watt and of Mr. Grim, certain collateral securities, from the avails of which were to be paid, first, the debt of $1500 which was not covered by the mortgage; and second, the mortgage debt.   Afterwards, in the same month, Crawford sold and conveyed the mortgaged premises to the Harlem Canal Company, subject to the mortgage; and the amount of the mortgage debt was deducted from the price which the company agreed to pay for the land.   In other words, the canal company purchased from, and paid Crawford for his equity of redemption, and nothing more.   As between them, the justice and equity of the case plainly was, that the mortgage debt should be paid by the company; and not by Crawford, or from his funds.   Then

in December, 1831, the appellant, James Ferris, purchased he equity of redemption at a sheriff's sale on a judgment against the canal company ; and in March, 1833, he received a deed. He paid only one or two hundred dollars for the property ; but whether more or less, he acquired only such rights as the canal company had. He came into their place, and was of course bound in equity and good conscience to pay the mortgage debt.

In May, 1831, seven months before the sheriff's sale, Crawford, the mortgagor, died, leaving six children, all under the age of twenty-one years ; and leaving no widow or other competent person to take charge of his affairs, or protect the rights of his children or creditors. Administration was granted to Oakley, a blacksmith residing in another county. It may be noticed here, that Ferris succeeded in purchasing the equity of redemption for a mere trifle, by representing at the sale that he was a relative of the children of Crawford, and intended to purchase the property for their benefit. He was in truth a cousin to the children : how he intended to benefit them we shall presently see.

In October, 1835, Watt, as before mentioned, filed his bill to foreclose the mortgage. He had, prior to that time, received enough from the collateral securities, to pay the $1500 debt which was not included in the mortgage; and also enough to pay more than three fourths of the amount of the mortgage debt. These payments, it will be remembered, were made from the moneys of Crawford, after he had conveyed the property subject to the mortgage. As between his administrator and Ferris, the owner of the property, there was a plain equity to have the amount which had thus been paid on the mortgage refunded to the administrator for the benefit of the creditors and children of Crawford. All this was well understood by Ferris. He not only knew that he had purchased the equity of redemption, and nothing more ; but the whole matter in relation to the collateral securities had been explained to him by Watt soon after the death of Crawford in 1831 ; and he was then told that if Crawford's money paid the mortgage debt, Crawford, or more properly his representative, would be substituted in the place of Watt

as owner of the mortgage. But instead of acting, as he professed to do, as the relative and friend of the children of Crawford, he did all he could to deprive them of their just rights. In his answer to the bill he insisted on having the benefit of the moneys which had been realized from the collateral securities. And what is still more remarkable, Oakley, the administrator, who should have stood up in defence of the children and creditors of Crawford, fully seconded the unjust claim which was set up by Ferris. These two defendants, representing interests in direct hostility to each other, appeared by the same solicitor, and put in substantially the same answer. It is not very important to inquire whether the administrator acted ignorantly, or through design. It is quite clear that Ferris intended to do a wrong to all who had an interest in the estate of Crawford. But truth is mighty; and notwithstanding all the pains which had been taken to cover it up, the assistant vice chancellor saw through the veil, and frustrated the plan of applying the money of Crawford's heirs to the payment of the debt of Ferris. By the decree in the foreclosure suit, made on the 15th of April, 1840, the amount remaining due to the complainant for principal and interest was settled at $1065,85; and the amount which the complainant had received from the collateral securities of Crawford was settled at $4396,05: and out of the moneys arising from the sale of the mortgaged premises, the master was directed to pay the complainant's costs, and the aforesaid balance of principal and interest due him: the master was then to pay the $4396,05 to the administrator of Crawford; and the surplus money was to be paid to Ferris as the owner of the equity of redemption. This decree rendered equal justice to all parties, by charging the whole mortgage debt on the land where it properly belonged.

Prior to this time Oakley had died, and administration *de bonis non* of William Crawford had been granted to his son James, who, in February, 1839, was substituted as a defendant in the place of Oakley. Although the decree secured nearly four thousand four hundred dollars to the new administrator, his solicitor strangely enough united with Ferris in an appeal to the chancellor. This leads to the remark, that although James

Crawford was made a party to the suit in 1839, it was done with out his knowledge or consent. The appeal was taken in the same way; and until February, 1843, he had never heard of the decree, nor of the mortgage, nor that this or any other chancery suit was in existence in which the estate of William Crawford had an interest. His name had been used by Ferris, and the solicitor of Ferris, without his knowledge, and in a way which, if he had known anything about it, he would have seen to be alike contrary to his duty as administrator, and against his interest as one of the children and heirs at law of William Crawford.

Having failed in the purpose of getting a decree which would enable him to appropriate to his own use the money of Crawford's children, and having no hope, beyond delay, from the appeal to the chancellor, Ferris entered upon another plan for accomplishing his object. Watt, the complainant, had an unquestionable right to the balance which had been decreed to him, with the addition of costs: and to nothing more. The other branch of the decree was made for the benefit of Crawford's estate. The appellant, Claiborne Ferris, went to the complainant's solicitor and told him his brother James had concluded to settle the matter: and on the 4th day of January, 1841, the amount due the complainant, with costs, was paid; and his solicitor was requested to sign a stipulation which had been prepared by the solicitor of James Ferris, agreeing, without qualification, that the bill should be dismissed. But the complainant's solicitor objected to signing it until it had been so amended as to make it a consent to dismiss the bill "as to the said complainant," and nothing more. As Crawford's administrator had an interest in the decree to more than four thousand dollars, it was rightly judged that it would not do to act upon this qualified consent to dismiss the bill, without getting an authority of some kind from the administrator. And this will introduce us to another chapter in the history of this fraudulent transaction.

In February, 1839, James Ferris went to the defendant, James Crawford, and told him Oakley was dead, and requested him to take administration. Crawford objected, that he had no time to spare—having to work for a living—and that he knew nothing

about the business or affairs of the estate. This I have no doubt was literally true. Ferris replied, that it was a mere matter of form; that the estate was insolvent; and that Crawford would never be troubled about it: that if he would go over to the surrogate's office and give in his name as administrator, he, Ferris, would attend to all the rest. Crawford yielded to the solicitation of his relative, and one whom he esteemed as his best friend, and took the administration. He did not take it for the purpose of protecting his own interest, or the interests of his brothers and sisters; for he did not know that his father had left any estate. Most of his property existed in such a form that his children could not see it; and James was told the wilful falsehood that the estate was insolvent. As the administration was now in the hands of one who knew nothing about the true state of the case —who supposed there was nothing for him to do—and who had entrusted every thing to the care of his professed friend, Ferris very naturally concluded that he should be able to succeed in the project of applying the money of Crawford's children to his own use. The first thing which he did under the license to act for the new administrator was to have him substituted in the place of Oakley, as a defendant. This was well enough. But the appointment of his own solicitor to be the solicitor also of James Crawford, when their interests were directly opposed, was, to say the least of it, a most shameless transaction.

Let us now inquire how the release, which was necessary to carry out the plans of Ferris, was obtained. It bears date January 13, 1841—nine days after the consent to dismiss the bill. It should be borne in mind that at this time James Crawford was totally ignorant of the decree, the suit, the mortgage, and every thing else connected with the controversy, except the single fact that he had been appointed administrator upon an estate which he had been taught to believe was insolvent. Such was his state of mind when Ferris applied for the release, or a "paper," as he called it. Ferris told him there was about $1800 money coming or due to the estate. that there were debts due from the estate to about the same amount: and that if he would sign a certain paper which Ferris would procure to be drawn up,

he, Ferris, could and would go on and buy up the debts, and thought by so doing he could save four or five hundred dollars to the estate. With the fullest confidence in the honor, integrity and friendship of Ferris, Crawford attended at the solicitor's office and signed the release, without knowing what was its real import or object. Every thing that Ferris told him as an inducement to sign the paper was false, and Ferris knew it. Instead of only $1800 due to the estate, there was a decree in favor of the administrator for $4400; and instead of $1800 of debts against the estate, these debts only amounted to from three to five hundred dollars. Instead of an estate which was worth nothing to the children, there would remain for them, after paying the debts, about four thousand dollars. Ferris was not only false in his account of the existing state of things, but he was false in his promise for the future. He did not "buy up" or pay the debts of the intestate; but left Crawford to be cited by the creditors of the intestate to render an account before the surrogate. This last transgression was the means of unveiling the whole scheme of fraud. It brought Crawford into connection with several individuals from whom he learned for the first time how grossly he had been deceived. This was in February, 1843. He thereupon appointed a new solicitor, and in May, 1844, the decree which had been made in his favor was affirmed by default. In August of that year, he gave notice to the solicitors of Ferris that he intended to proceed to the sale of the mortgaged premises under the decree. On the 3d of October following, the sale, which had been duly advertised, was made, and the property was purchased by Crawford for the sum of three thousand dollars.

Ferris seems now to have thought himself in some danger; and on the 10th of October, 1844, he gave notice of the motion out of which this appeal has grown. The motion was for an order setting aside the sale, dismissing the bill, and perpetually staying all proceedings under the decree. The motion was founded principally on the release; and its object was to carry out the plan of wronging the creditors and orphan children of William Crawford. Such a motion never ought to prevail; and

never shall, with my consent. Fraud in all its forms is a thing to be abhorred; and it is especially odious when practised upon the young, the ignorant and the defenceless.

The motion was granted by the vice chancellor; but on appeal to the chancellor, the order was reversed; and the motion was denied with costs. That was a righteous judgment, which will, I trust, be upheld here, and every where. It took nothing from either party; but left them in possession of all such legal and equitable rights as they had before the motion was made. It was only a refusal to give effect to a release obtained by bad means, to be used for bad ends.

A good deal was said on the argument about setting aside a release on motion, instead of awarding an issue to try its validity. There is no doubt but that a release may be set aside or cancelled on motion. It has been done repeatedly. This is abundantly proved by the cases cited at the bar. And as to awarding an issue, that is not according to the usual course of the court of chancery. That court adjudicates upon questions of fact, as well as of law; and overturns deeds, and even judgments, for fraud, without the aid of a jury. And finally, the vice chancellor was not asked to set aside the release, nor has it been set aside by the chancellor. It is in as full force now as it ever was. The chancellor has only refused to give effect to the release; and it would be strange indeed if any court could not do that, when an instrument obtained by wicked means, for wicked ends, is brought forward as a ground for either making or opposing a motion.

Then it is said that the appellants have not had an opportunity to answer the allegation of fraud. There is not a word in the case going to justify the remark; and for one, I disclaim all authority to review the decisions of the chancellor, or of any other court, upon the suggestions of counsel, or upon any thing else not appearing in the papers before us. When the allegation of fraud was set up in the opposing papers, the appellants might have withdrawn their motion, and renewed it at another time on papers repelling the charge, if such could be procured. Or they might have asked the vice chancellor to suspend the motion

until they could answer the opposing affidavits; and there can be no doubt that the application would have been granted. But they evidently chose to go on with the motion upon the papers as they were, and take the chances of a decision in their favor. They probably said to the vice chancellor, " we are honest men, and could answer the charge of fraud if we chose to do so; but we insist that you cannot try the validity of the release in this form, and therefore our motion must be granted." And beyond this, they probably argued there, as they have here, that no fraud was proved by the opposing papers. But whatever was the course of the argument, the matter, after it had been under discussion for more than a week, was left for decision on the papers as they then stood. The vice chancellor decided in favor of the appellants. Upon what ground, does not appear: but whether he held that there was no fraud, or that he ought not to inquire into it, he was, I think, equally in error; and that error has been properly corrected by the chancellor.

It has been further urged, that the chancellor should have awarded an issue to try the question of fraud, or sent the motion back to be re-heard by the vice chancellor. It would not have been according to the usual course of the court to do either of these things. And besides, there is nothing in the case to show that the chancellor was requested to award an issue, or order a rehearing. Nor has it been even suggested by counsel that any such request was made. It will be time enough to review the chancellor's judgment upon such a motion, after the motion shall have been made and decided.

A loud complaint is made that the appellants are in danger of suffering damage in consequence of the denial of their motion. If the fact be so, it is a state of things which has been brought about by their own misconduct. They should have come into court with clean hands, asking nothing but equity. But instead of doing that they in the first place perpetrated a gross fraud upon the administrator, and then came and asked the court to aid them in consummating the injustice. If the motion had been granted, they would have accomplished their object, and appropriated $4400 of the administrator's money to their own use.

In other words, they would have got the land for a sum less by that amount than they had agreed to pay for it. They purchased subject to the whole mortgage debt, of which they have only paid a small part. The rest they seek to throw upon the creditors and children of the mortgagor. If the appellants had relinquished their fraudulent purpose, and offered to pay the amount decreed to the administrator, it is quite probable that the sale would have been set aside. Indeed, I do not doubt that it would have been voluntarily relinquished; for there is nothing in the case to show that the administrator desires any thing more than simple justice.

The appellants insist that the decree was satisfied by the payment which was made to Watt, the complainant; and that there was no longer any authority to sell. If that be so, then no title has passed by the sale, and the appellants will not be injured by allowing it to stand. And here I may remark, that by affirming the chancellor's order we decide nothing concerning the validity of the sale. We simply say that it was right to deny the motion. That leaves it open to the appellants to try the validity, both of the release and the sale, in an action of ejectment. But if they will take my advice, it is that they pursue the safer and better course of paying the administrator what is justly due him, with costs: and should the administrator refuse to accept the money and relinquish the sale, there can be little doubt that he may be compelled to do it. And so the worst thing that can happen from our affirming the chancellor's order is, that the appellants may be obliged either to give up the land, or to do equity, and pay the whole mortgage debt.

What I have said, relates principally to the appellant, James Ferris. In January, 1839, he conveyed the property to his brother Floyd T. Ferris and took back a mortgage for $4500. The beneficial interest in that mortgage is now claimed by Claiborne Ferris; and for that reason he made himself a party to the motion, although not a party to the suit. If it was proper for him to join in the motion, then Floyd T. Ferris should also have joined, for he owns the equity of redemption. But we need not trouble ourselves about the question of parties, nor

about the transactions between these brothers. Whatever equities may exist as between themselves, it is sufficient to say that Floyd and Claiborne both came in under James, and pending the foreclosure suit. They acquired no greater rights than he had ; and of course they hold the property subject to the original mortgage to Watt, and to the decree which has been made upon it.

In every view of the case, I am of the opinion that the order of the chancellor is right and should be affirmed.

On the question being put, "Shall this decree be reversed?" all the members of the court who were present and heard the argument, to wit: The CHIEF JUSTICE, and *Senators* BACKUS, BARLOW, BEEKMAN, CHAMBERLAIN, CLARK, DEYO, EMMONS, FOLSOM, HARD, JONES, LOTT, MITCHELL, PORTER, SCOVIL, TALCOTT and VARNEY (17) voted in favor of affirming.

Decree affirmed.