CELESTINA CARABALLO VDA. DE TORRES, en su carácter de madre con patria potestad sobre sus hijos menores de edad nombrados RAFAEL y JOSÉ MANUEL TORRES Y CARABALLO, recurrente, *v*. EL REGISTRADOR DE LA PROPIEDAD DE GUAYAMA, recurrido.

No. 933.—*Sometido:* Enero 14, 1935. *Resuelto:* Julio 24, 1935.

*C. Domínguez Rubio,* abogado de la recurrente; El registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

En agosto de 1930 Carrillo y su esposa otorgaron una hipoteca para garantizar un préstamo con intereses al 12 por ciento. El préstamo y la hipoteca vencieron el primero de agosto de 1933. Una ley para enmendar la sección primera de la "Ley sobre fijación del interés en toda clase de obligaciones, aprobada en 1°. de marzo de 1902, según fué enmendada por la del 12 de marzo de 1903, y para otros fines," empezó a regir el 17 de agosto de 1933. Primera sesión extraordinaria de ese año, página 27. La sección primera, tal cual ha sido enmendada, dispone:

". . . . que no podrá fijarse un tipo de interés, por convenio especial, que sea mayor de nueve (9) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, cuando el capital objeto del préstamo o del convenio no exceda de $3,000, y de ocho (8) dólares anuales por cada cien (100) dólares, cuando pase dicha cantidad."

En junio de 1934 el término de la obligación fué prorrogado por un período adicional de dos años a partir del primero de agosto de 1933 en lo que a un saldo insoluto de $700 se refería, continuando en vigor por convenio expreso todas las demás disposiciones del contrato original. El registrador de la propiedad inscribió este documento en lo que a la cancelación parcial de la hipoteca y a la prórroga de la misma se refería, pero se negó a inscribirlo en lo atinente a la continuación de la cláusula contenida en el contrato original relativa al pago de intereses a razón del 12 por ciento, fundado en que este convenio infringía la enmienda de 1933.

El contrato original no contenía disposición alguna respecto al tipo de interés en caso de que no se efectuara el pago a su vencimiento. En ausencia de tal disposición los acreedores hipotecarios, si hubiesen instado acción sobre el contrato original, hubieran podido recobrar intereses a razón del 6 por ciento anual solamente a partir de la fecha del vencimiento y de la falta de pago. Véase artículo 1061 del Código Civil (Ed. de 1930); *Goico* v. *Rodríguez, et al.,* 28 D.P.R. 530; *Cook* v. *Fowler,* 14 E. R. C. 546, y otros casos citados en 33 C. J. 226, sección 111, y la decisión de la Corte Suprema de España de junio 7, 1922, 156 Jurisprudencia Civil 464. Cualquier derecho a cobrar intereses a un tipo más elevado después del vencimiento y de la mora debe fundarse enteramente en el nuevo contrato. El hecho de que este nuevo pacto no equivaliera a una novación del contrato original no sirve de respuesta a la objeción de que el nuevo convenio infringía la sección primera de la ley. Las partes contratantes originales pudieron haber celebrado el nuevo contrato en cualquier momento antes de empezar a regir la ley de 1933. Después de esto no podían celebrar ningún contrato válido para el pago de intereses al 12 por ciento. El resolver que la ley es aplicable a un convenio de tal índole, celebrado unos diez meses después de haber empezado a regir la misma, no significa interpretar ésta en forma tal que equivalga a darle efecto retroactivo.

El recurrente asume que el documento otorgado en junio de 1934 meramente ratificó un contrato anterior celebrado con antelación al 17 de agosto de 1933, pero no hallamos nada en los autos que sostenga esta teoría. Otra contención es que la prohibición relativa a contratos para el pago de intereses a un tipo mayor del 8 ó 9 por ciento es aplicable, al igual que la primera parte de la sección primera de la ley, tan sólo a contratos verbales. La primera parte de la sección 1 dispone:

"Que a falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cual-

quier clase de obligación o contrato, o con ocasión de un fallo o sentencia que no se haya cumplido, será de seis (6) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto. . . .''

El ''convenio especial'' a que se hace referencia en el disponiéndose ·que aparece más arriba es un convenio por escrito y no un pacto .verbal. La interpretación sugerida por el recurrente haría que hubiera en la sección una contradicción directa en sus términos. Un examen cuidadoso de las secciones 3, 4 y 5 de la ley (Estatutos Revisados de 1911, secciones 4174, 4175 y 4176) debería bastar para disipar cualquier duda que pueda haber sobre la cuestión que aquí se trata de suscitar.

En el curso de nuestra propia discusión del caso, después de haberse escrito lo anterior y sometido en forma de memorándum, se ha suscitado una cuestión relativa a la jurisdicción del registrador para considerar si las partes tenían o no el derecho a convenir en prorrogar el término de la hipoteca al tipo del 12 por ciento. Se dice: que una persona que no tiene interés en la transacción no puede suscitar la defensa de usura; que una corte sentenciadora no consideraría la cuestión de usura a no ser que ésta fuera planteada por el prestatario o por alguien que tuviera nexo jurídico con él o que tuviese interés en tal defensa; que estos principios están resumidos en 66 C. J. 314, párrafo 314; que la sección 315 del artículo sobre usura en el referido tomo discute los derechos de los fiduciarios y causahabientes; que la sección 316 habla sobre la cuestión de si una transacción es nula o anulable; y que ''la nota del registrador es esencialmente análoga a las notas de los registradores en el caso de *Compañía Azucarera del Toa* v. *Registrador* 19 D.P.R. 759, y otros.''

En *Compañía Azucarera de la Carolina* v. *Registrador,* 19 D.P.R. 152, el registrador de la propiedad se había negado a inscribir el traspaso de ciertos terrenos a una corporación,

debido a que de otros asientos del registro se desprendía que dicha corporación ya era dueña de más de quinientos acres. Su teoría fué que el adquirente no tenía capacidad legal para adquirir la finca en cuestión. Esta corte resolvió que la ley invocada por el registrador no prohibía tal adquisición. No importa el lugar que pueda haber para diversidad de criterio respecto al efecto del estatuto que tenemos ante nuestra consideración sobre contratos usurarios, no podría sostenerse seriamente que tales contratos no están expresamente prohibidos y declarados nulos por ese estatuto.

No es necesario que citemos de la opinión emitida en el caso de la Compañía Azucarera de la Carolina para acentuar la diferencia existente entre la escritura de enjenación a una corporación que ya posee más de quinientos acres y un contrato usurario. En el primer caso el contrato es enteramente válido entre las partes y tan obligatorio para la corporación como para el vendedor. Ni siquiera es viciado por un defecto subsanable que ha de hacerse constar en el registro a fin de proteger futuros compradores, acreedores u otras personas que en el futuro puedan interesarse en la finca. En el segundo caso el prestatario no está en la obligación legal de pagar ningunos intereses al tipo especificado o al legal. El prestamista no puede recobrar del prestatario ante una corte de justicia parte alguna de tales intereses ni más de tres cuartas partes del principal. Un cesionario del prestamista en lo que a la responsabilidad del prestatario se refiere, no está en mejor posición que el prestamista mismo.

Aún si el prestatario ha pagado los intereses de un contrato usurario, éste puede, dentro del término de un año contado a partir de la fecha de tal pago, recobrar el exceso. Un acreedor hipotecario que trata de inscribir su contrato no exigible por intereses en abierta violación de la ley que fija un límite al tipo de interés que se permite a las partes estipular en cualquier contrato, está en una situación muy distinta a la de una corporación que trata de inscribir una escritura de enajenación por la cual ha adquirido terrenos

en exceso de los quinientos acres especificados en la Carta Orgánica.

En el presente caso los hechos son incontrovertidos. El registrador no ha juzgado ni tratado de juzgar casos que envuelven cuestiones disputables de hecho.

En el caso de la *Compañía Azucarera del Toa* v. *Registrador*, 19 D.P.R. 759, este tribunal dijo:

"Los únicos hechos que diferencian a este recurso gubernativo del caso No. 123, seguido por la Compañía Azucarera de la Carolina v. El Registrador de la Propiedad (pág. 152), son que en este caso aparece que el recurrente solicita del registrador que inscriba de una vez un traspaso que se le hizo de unas setecientas cuerdas de terreno. Pero una de las principales razones que tuvimos en dicho caso para revocar la nota del registrador fué que hasta tanto el Fiscal General no tomara intervención, o en otras palabras, el gobierno, el título de una sociedad agrícola era válido contra todo el mundo. Esto resultó claro no solamente por nuestras propias palabras sino también por las citas de la Corte Suprema de los Estados Unidos. Por tanto, el hecho de que la corporación resulte estar adquiriendo una cantidad mayor de quinientas cuerdas de terreno, no establece diferencia alguna.

"Por este fundamento y por otros que han sido expresados en el mencionado caso No. 123 de la Compañía Azucarera de la Carolina v. El Registrador, debe revocarse la nota recurrida."

En el caso de la Compañía Azucarera del Toa, al igual que en el de la Compañía Azucarera de la Carolina, la ley invocada por el registrador no afectaba directamente el traspaso en cuestión. En lo que a las partes contratantes se refería, al igual que la enajenación en el caso de la Compañía Azucarera de la Carolina, no era nulo ni anulable. Cualquier procedimiento que un Fiscal General pudiera instituir no podía alterar ese hecho. En el presente caso la ley va directamente al contrato prohibiendo el otorgamiento del mismo y disponiendo además que éste no podrá hacerse efectivo en ninguna corte, ". . . . y la corte deberá, además, disponer en la sentencia condenando al deudor al pago del capital que el acreedor recobre solamente de su deudor el setenticinco

por ciento de dicho capital y que el veinticinco por ciento restante sea adjudicado y recobrado por El Pueblo de Puerto Rico, quien podrá obtener mandamiento de ejecución del mismo modo que el demandante. . . .'' El Fiscal General no necesita instituir ningún pleito o procedimiento, como tampoco ninguna otra persona, para exigir la penalidad. Aun si no fuese así, el hecho de que el otorgamiento del contrato que tenemos a la vista esté expresamente prohibido por la ley, así como el hecho adicional de que por disposición expresa de la ley tal contrato no pueda hacerse efectivo en una corte de justicia, debe bastar para distinguir el presente caso de los otros dos.

De existir alguna analogía entre el presente recurso y los otros dos, ella debe hallarse en el hecho de que cuando se trata de una corporación que posee más de quinientos acres de terreno, sólo el Fiscal General puede instituir un procedimiento contra la corporación, mientras que cuando se trata de un contrato usurario, únicamente el prestatario. y las partes que de éste deriven derechos pueden interponer la defensa de usura. La analogía, de existir, no es muy aparente; o, de serlo, es más aparente que real. El registrador no se halla en la posición de un litigante que trata de escudarse tras la naturaleza usuraria de un contrato hacia el cual es un extraño. Él es un funcionario público investido por la ley con el deber y la responsabilidad de calificar la validez de los contratos presentados para su inscripción en el registro de la propiedad. Cuando los hechos aparecen de la faz del documento, su facultad para calificar si el documento es inscribible es tan clara como la facultad del Fiscal General para instruir cualquier pleito o procedimiento expresamente autorizado por la ley, o como la facultad y el deber de cualquier corte para dictar sentencia en tal pleito o procedimiento. El resultado de su decisión será que el documento es o no inscribible. Si el documento tiene un defecto subsanable, se inscribe y se hace constar el defecto. Si el defecto es insubsanable, el documento no se inscribe.

Los defectos subsanables e insubsanables son definidos y distinguidos en el artículo 65 de la Ley Hipotecaria y en el artículo 110 del Reglamento. La diferencia entre un contrato que está viciado por un defecto subsanable y uno que está viciado por un defecto insubsanable puede o no ser idéntica a la diferencia existente entre los contratos anulables y los nulos. Sea ello como fuere, ninguna cuestión resuelta por el registrador es *res judicata*. Ni la opinión del registrador sobre las cuestiones de derecho envueltas ni la opinión de este tribunal al resolver un recurso gubernativo es obligatoria para esta corte o para cualquiera otra al resolver cualquier pleito o procedimiento posteriores. Por tanto, no podemos concurrir en el criterio de que: "La nota del registrador es esencialmente análoga a las notas de los registradores en los casos de *Compañía Azucarera del Toa* v. *Registrador*, 19 D.P.R. 759, y otros", ni en el criterio de que "El registrador no tiene jurisdicción para considerar si las partes en este caso tenían o no derecho a prorrogar la hipoteca" al tipo del 12 por ciento anual.

■■ El contraalegato no contiene ninguna discusión de la cuestión relativa a si un contrato usurario es nulo o meramente anulable, ni ningún comentario sobre la sección 316 del artículo sobre usura que aparece en 66 Corpus Juris, a que se ha llamado nuestra atención. Por ende, nos referiremos brevemente a unos pocos de los casos más importantes citados respecto a la disposición contenida en dicho artículo, a saber:

"Si bien existe aparentemente alguna autoridad en sentido contrario, aun la declaración terminante del estatuto de que los contratos, documentos, transacciones o títulos usurarios serán nulos, es interpretada generalmente por las cortes en el sentido de que éstos son anulables a opción del prestatario, de sus fiduciarios o causahabientes. . . ."

En el caso de *Williams* v. *Tilt*, 36 N. Y. 319, 326 (Libro VIII, N. Y. Court of Appeals Rep. 112) hallamos el siguiente *dictum* u *obiter dictum:*

"El contrato no es absolutamente *nulo*, sino solamente *anulable*, a opción del prestatario, de sus fiduciarios o causahabientes. Por tanto, ninguna otra parte puede suscitar la objeción. 2. Pars. Notes and Bills, 407; Jackson v. Henry, 10 Johns. 185; 6 Am. Dec. 328; Shufelt v. Shufelt, 9 Paige 145; 37 Am. Dec. 381; Post v. Bank of Utica, 7 Hill 391, 406; De Wolf v. Johnson, 10 Wheat. 367, 393; Green v. Kemp, 13 Mass. 515; 7 Am. Dec. 169; Bridge v. Hubbard, 15 Mass. 103; 8 Am. Dec. 86; Morris v. Floyd, 5 Barb. 136; Bullard v. Raynor, 30 N. Y. 197; Billington v. Wagoner, 33 id. 31."

De la opinión del caso de *Shufelt* v. *Shufelt*, 37 Am. Dec. 381, 384, hacemos el siguiente extracto (bastardillas nuestras):

"En el caso corriente en que el dueño de una finca hipotecada celebra un contrato usurario y el estatuto ha declarado que la garantía usuararia es nula, el deudor tiene, desde luego, el derecho a vender su finca o a hipotecarla, tal cual si la referida hipoteca nula nunca hubiera existido. Y el comprador en tal caso necesariamente adquiere todos los derechos que tenía el vendedor para impugnar la validez de la garantía usuraria. Pues si el deudor hipotecario original no tenía tal derecho, los bienes hasta cierto punto serían inalienables en su poder; no obstante ser el gravamen *enteramente nulo en lo que a él se refería*. Empero, si lo cree prudente, puede confirmar la hipoteca usuraria, vendiendo la finca sujeta al pago o al gravamen de la misma. Y el comprador en tal caso adquiere tan sólo el derecho de redención (*equity of redemption*) y no puede atacar la validez de la hipoteca anterior por razón de la usura. Green v. Kemp, 13 Mass. 515 (7 Am. Dec. 169); Bridge v. Hubbard, 15 Id. 103 (8 Am. Dec. 86). Pero tratándose de una sentencia, como la presente, que es una deuda válida y subsistente contra el demandado y un gravamen sobre sus bienes inmuebles, por lo menos hasta que crea prudente instituir algún recurso legal para dejar sin efecto tal sentencia, existe una evidente incorrección al permitir que cualquier adquirente voluntario, o acreedor hipotecario de cualquier parte de la finca sobre la cual pesa tal sentencia, instituya un recurso a su nombre para atacar la validez de esa sentencia. . . ."

En el caso de *Green* v. *Kemp*, 7 Am. Dec. 169, 170, la Corte de Massachusetts dijo:

"Aunque por el estatuto de 1783, capítulo 85, sección 1, se declara que son enteramente nulas todas las hipotecas con intereses

usurarios, sin embargo, nunca pudo ser la intención que un extraño pudiera inmiscuirse en la hipoteca o penetrar en la finca y alegar que estaba justificado a hacerlo de acuerdo con el estatuto, cuando todas las partes interesadas en el contrato estaban dispuestas a allanarse al mismo. Al estatuto debe dársele una interpretación razonable en armonía con su espíritu general, que no fué otro que proteger a los deudores de exigencias irrazonables. Una hipoteca con intereses usurarios es por tanto nula, por ser perjudicial al deudor hipotecario y a aquéllos que de él adquieran legalmente la finca: Carter v. Chaycole, Bac. Abr. Title, Usury, E.; citando a León, 307, pl. 427; Bull N. p. 224; Bearce v. Barstow, 9 Mass. 48 (6 Am. Dec. 25)." (Pág. 170).

Según indica la corte en el caso de *Morris* v. *Floyd,* 5 Barb. 130, después de revisar extensamente las autoridades anteriores a 1849, el principio en que se niega la defensa de usura a una persona que ha adquirido bienes sujetos a una hipoteca usuraria, "se basa en la suposición de que al adquirir se hizo una bonificación en el valor o precio convenido a fin de exonerar del gravamen los bienes adquiridos, y de que bajo tales circunstancias no debía permitírsele que se aprovechara de un estatuto que no se intentó para su beneficio."

En el caso de *Billington* v. *Wagoner,* 33 N. Y. 31 (Tomo VII, N. Y. Court of Appeals Reports 404), en que el demandante trató de recobrar fundado en un pagaré, se dijo:

". . . . Durante el juicio, se averiguó que después de vencido el pagaré, allá para el primero de diciembre de 1857, el demandante y James Wagoner, el principal, convinieron, en consideración a que Wagoner entregara al demandante un cerdo valorado en la suma de $11.25, y relevara al demandante del pago de dos fanegas de patatas, anteriormente vendidas y entregádasle por el demandante, cuyo valor no se precisa, que el demandante prorrogaría el pago de dicho pagaré hasta el otoño de 1858. Este litigio fué iniciado en abril de 1858. El letrado del demandante solicitó de la corte que instruyera al jurado que si éste creía que el convenio aducido en la demanda había quedado probado y que tal convenio en realidad de verdad había sido celebrado por las partes, sin embargo, tal pacto, sería usurario y por ende nulo, y no constituía una defensa válida y que el demandante, a pesar de todo ello, tendría

derecho a un veredicto por el saldo del pagaré mencionado en la demanda. El juez se negó a dar tales instrucciones al jurado y el letrado del demandante se anotó una excepción.''

El nervio del fallo en apelación se desprende suficientemente del sumario. Éste dice así:

"La defensa de usura puede ser planteada solamente por el prestatario original, sus fiadores, herederos, legatarios, o representantes personales.''

Éstos y otros casos citados en *Williams* v. *Tilt,* supra, dejan de establecer la doctrina sentada como premisa del *dictum,* o sea que: "El contrato no es enteramente *nulo,* sino tan sólo *anulable,* a opción del prestatario, de sus fiduciarios o causahabientes.''

El *dictum* u *obiter dictum* contenido en el caso de *Williams* v. *Tilt,* ha sido repetido en el de *Froude* v. *Bishop,* 25 App. Div. 514, donde se cita 36 N. Y. 325, y se ponen en bastardillas las palabras "nulo" y "anulable", pero sin hacer un razonamiento para ello ni citar otras autoridades.

En *Chapuis* v. *Mathot,* 91 Hun. 565, la corte dijo, en la página 568:

"El derecho a suscitar la cuestión de usura es enteramente personal al prestatario y a sus fiduciarios o causahabientes, y el contrato usurario es anulable a opción del prestatario o de los que de éste deriven derechos. En el caso de Williams v. Tilt, (36 N. Y. 319, 325), se hace un resumen del estado de la ley sobre la materia. Después de referirse al caso de Dix v. Van Wyck (2 Hill 522) y al de Post v. Dart (8 Paige 639), en que se resolvió que un tercero no podía impugnar la validez de una garantía usuraria y que la defensa de usura podía ser utilizada por cualquier causahabiente o fiduciario de la persona que prestó tal garantía, la corte dice: 'Hasta este extremo han llevado los casos ese derecho, *y aun el derecho de los fiduciarios puede hacerse desaparecer por la renuncia del compareciente original.* (Sands v. Church, 2 Seld. 347). El contrato *no es enteramente nulo* sino *solamente anulable,* a opción del prestatario, de sus fiduciarios o causahabientes. Por tanto, ninguna otra persona puede suscitar la objeción.' Esta consideración está respaldada por una larga lista de autoridades que se citan en la opinión.''

Por las razones ya expuestas no podemos concurrir ni con la confirmación del *dictum* del caso de *Williams* v. *Tilt* en lo que a la cuestión de la naturaleza nula o anulable de un contrato usurario se refiere, ni en el criterio de que el *dictum* está fortalecido a este respecto por la "larga lista de autoridades citadas en la opinión."

Varias porciones del artículo que tiene Corpus Juris sobre usura parecen haber sido preparadas por distintos autores. La persona que escribió la sección 316 no cita todas las autoridades que pudieron incluirse entre aquéllas en que se hace referencia en su admisión de que: "Aparentemente hay autoridades que se expresan en sentido contrario." Como punto de partida para una ulterior investigación podemos referirnos de paso a la sección 180 del mismo artículo en la página 237, como una exposición más comprensiva, con citas de autoridades adicionales, incluyendo el caso de *Horton* v. *Robert,* 11 D.P.R. 176. En dicho caso esta corte, según estaba constituída para aquella época, estuvo unánime en los puntos principales. La divergencia de opinión surgió sobre ciertas cuestiones de hecho. La opinión concurrente tiende a indicar que el caso de *Lloyd* v. *Scott,* 20 U. S. 226, citado en la opinión de este tribunal, nunca ha sido revocado y admite la fuerza obligatoria para este tribunal, de la opinión allí emitida. El ponente dice entonces (esto no aparece en el texto castellano y se traduce aquí del inglés):

"Además, la interpretación dada a estatutos similares sobre intereses en aquellos estados que impiden que el cesionario de bienes plantee la cuestión de usura, depende de ciertos principios de equidad que nunca han sido aplicados en Puerto Rico y cuya aplicación, a la luz del estatuto especial sobre la materia, no se ha confiado a las cortes de esta Isla. Habiendo la Legislatura determinado la política de la ley, la interpretación del estatuto es la que se le ha dado en la opinión de la corte y la que está en armonía con los principios establecidos en el capítulo primero del Código Civil."

De la opinión de la corte en el caso de *Horton et al.* v. *Robert,* a las páginas 185, 186, tomamos el siguiente extracto:

"La ley de Puerto Rico con respecto al asunto de usura, cuya ley se ha citado extensamente en este dictamen, es más estricta y vigorosa que muchas leyes de su clase. Dicha ley dispone que los contratos usurarios son completamente nulos; y se autoriza al tribunal competente para que en una demanda debidamente entablada, ordene la suspensión del cobro de la suma en cuestión, o la de cualquier procedimiento que se instruya para hacer cumplir tal contrato; y el tribunal podrá ordenar la anulación de la escritura original de tal contrato; y en la misma ley se dispone que para conceder la reparación anteriormente mencionada, no se impondrá como requisito que se pague la suma principal, ni sus intereses, ni parte ninguna de ellos, como suele hacerse en algunos de los Estados en donde la ley es menos rigurosa.

"En muchos de los Estados, las leyes sobre usura sólo hacen perder al prestamista, o a la parte que haya estipulado en algún contrato un tipo de interés ilegal, los intereses o el exceso de los intereses sobre el tipo legal, imponiéndole esa pérdida como castigo; de modo que tales contratos no son considerados por los tribunales como completamente nulos, sino solamente como anulables cuando se entable en debida forma una demanda por parte de la persona que solicitó y obtuvo el préstamo, o que se comprometió a pagar los intereses usurarios. Esto ha dado lugar, en los diferentes estados, a una variedad de decisiones con respecto a las cuestiones implicadas, cuyas decisiones varían según los términos de las diferentes leyes de dichos Estados; y con referencia a tales leyes, el Tribunal Supremo de los Estados Unidos, en el caso de Fletckner v. United States Bank, 21 U. S. 355, dice lo que sigue:

" 'Las leyes sobre usura, de los Estados de la Unión, lo mismo que las de Inglaterra, contienen disposición expresa de que los contratos usurarios serán completamente nulos; y sin semejante disposición legislativa el contrato sería válido a lo menos en cuanto a personas que fueron ajenas a la usura.'

"Esta proposición contiene un sentido negativo muy claro, y es que donde existen tales disposiciones legales que anulen contratos de esta índole, como sucede en Puerto Rico, el contrato es completamente nulo con respecto a cualquiera persona. La Corte Suprema de los Estados Unidos, 75 años más tarde, emitió la siguiente proposición:

" 'Cuando un estado cree que los males de la usura se evitan mejor haciendo los contratos usurarios nulos, y dando a los prestatarios el derecho de hacer anular y cancelar incondicionalmente

tales contratos por los tribunales, como en el presente caso, tal opinión que afecta al orden público y se refiere a contratos hechos en dicho Estado, y que se trata de hacer cumplir en él, es obligatoria para las cortes ferederales, ya estén procediendo en equidad o en ley; y la ley local, constituída por los estatutos aplicables al caso, tales como hayan sido interpretados por la Corte Suprema de dicho Estado, nos da la regla para la decisión.' (Missouri, Kansas and Tex., Trust Co. v. Krumseig, 172 U. S. 35).

"No puede haber duda alguna de que Puerto Rico es uno de los Gobiernos que siguen la opinión emitida por la Suprema Corte en el párrafo últimamente citado, y que la intención de la Legislatura en esta Isla fué, que los contratos usurarios, cuando se demostraba que tal eran, deberían ser considerados por nuestros tribunales completamente nulos, con respecto a toda persona y para cualquier propósito; y siendo esto así, cualquier persona que tenga interés en el asunto, sea parte en el contrato original o no, podrá valerse de este hecho y consignarlo en cualquier alegación que sea pertinente."

Para los efectos de esta opinión, podría admitirse, sin resolverlo, que en el caso de *Horton et al.* v. *Robert,* esta corte, a no ser por el caso de *Lloyd* v. *Scott,* quizá pudo haber interpretado el estatuto, tal cual regía entonces, en el sentido de que un contrato usurario era enteramente nulo para todos los fines entre las partes y sus fiduciarios, pero no enteramente nulo para todos los fines en lo que a extraños se refería. Una cosa es interpretar ese estatuto en esta forma y otra cosa muy distinta es interpretarlo en el sentido de que los contratos usurarios son anulables, mas no nulos, entre las partes mismas. Tal interpretación hubiese equivalido a la derogación *pro tanto* de un estatuto enteramente claro y enfático mediante legislación judicial disfrazada de interpretación estatutaria. No hallamos base satisfactoria en el contraalegato ni en las secciones 315 y 316 del artículo sobre usura en Corpus Juris para modificar o abandonar por ahora la conclusión a que se llegó en *Horton et al.* v. *Robert* respecto a la nulidad absoluta de un contrato usurario entre las partes contratantes y sus fiduciarios bajo el estatuto que regía desde 1903 a 1907. Si debe llegarse o no a la misma

conclusión bajo nuestra ley de usura, según la misma ha sido enmendada posteriormente, es cuestión que no se discute en el contraalegato y a la que de momento sólo es necesario hacer referencia de paso.

Las secciones 1, 4 y 5 de la ley, tal cual fué originalmente aprobada (Estatutos Revisados de 1902, secciones 359, 362, 363), leían así:

"Sección 1.—A falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cualquier clase de obligación o contrato, o con ocasión de un fallo o sentencia no cumplido, será de doce ($12) dólares anuales sobre cada cien ($100) dóllars o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto. *Disponiéndose, sin embargo,* que no podrá fijarse un tipo de interés por convenio especial que exceda de doce ($12) dollars anuales sobre cada cien ($100) dollars o sobre su equivalente en valor.

"Sección 4.—Excepto como queda autorizado por la sección tercera de esta Ley, ninguna persona podrá exigir o recibir, directa o indirectamente, dinero o mercancías, ni por comisión o descuento o ni otra forma cualquiera, un tipo de interés mayor por el préstamo o la prórroga de algún dinero, que el tipo fijado por la presente.

"Cualquier contrato en el cual directa o indirectamente se reserve, acepte o asegure o se comprometa a reservar, aceptar o asegurar, un tipo de interés mayor que el ·que se permite por esta Ley, es completamente nulo; y el tribunal competente, en un juicio adecuado, podrá suspender el cobro de dicho interés o cualquier procedimiento para hacer cumplir el contrato, y podrá ordenar que el contrato original quede anulado; y para conceder esta reparación no se impondrá como requisito que se pague la suma principal, ni sus intereses, ni parte ninguna de ellos.

"Sección 5.—Cualquier persona que por un préstamo o su prórroga pagase o entregase una suma o valor mayor que el fijado por esta Ley, como tipo legal, podrá por sí o por medio de sus representantes, dentro de un año después de hecho el pago o la entrega, recobrar, por medio de un juicio, el exceso de dinero o valor pagado de más sobre el interés legal, de la persona o su representante, que lo haya aceptado o recibido."

Las primeras dos secciones fueron enmendadas en 1903 y 9107, respectivamente, (Estatutos de 1911, secciones 4172 y 4175) para que leyeran como sigue:

"Sección 1.—Que a falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cualquier clase de obligación o contrato, o con ocasión de un fallo o sentencia que no se haya cumplido, será de seis dollars (6) anuales sobre cada cien dollars ($100) o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto; *Disponiéndose, sin embargo,* que no podrá fijarse un tipo de interés, por convenio especial, que exceda de doce dollars ($12) anuales sobre cada cien dollars ($100) o sobre su equivalente en valor. Dentro de los límites que por esta Ley se fijan, será legal descontar letras y pagarés y otras obligaciones análogas.

"Sección 4.—Excepto como queda autorizado por la sección 3 de esta ley, ninguna persona podrá exigir o recibir, directa o indirectamente, dinero o mercancías, a un tipo de interés mayor por el préstamo o la prórroga del préstamo de algún dinero, que el tipo fijado por la presente.

"Cualquier contrato en el cual se reserve, acepte o asegure, o se convenga en reservar, aceptar o asegurar un tipo de interés mayor que el que se permite por esta Ley, es completamente nulo en todos sus efectos en cuanto al interés; y el tribunal competente, en un juicio adecuado, podrá suspender el cobro de dicho interés y todo procedimiento para hacer cumplir dicho contrato será nulo en lo que se refiere al interés."

La sección 4 fué también enmendada en 1916 (Leyes de ese año, página 103) para que leyera así:

"Sección 4.—Excepto como queda autorizado por la sección 3 de esta ley, ninguna persona podrá exigir o recibir, directa o indirectamente, dinero o mercancías, a un tipo de interés mayor por el préstamo o la prórroga del préstamo de algún dinero, que el tipo fijado por la presente. Nada de lo contenido en esta ley se interpretará en el sentido de prohibir la venta de efectos al contado a un precio más bajo que al crédito.

"Ningún contrato en el cual se reserve, acepte o asegure, o se convenga en reservar, aceptar o asegurar, un tipo de interés mayor que el que se permite por esta ley, podrá hacerse efectivo en una

corte de Puerto Rico, sino por el importe del capital adeudado; y la corte deberá, además, disponer en la sentencia condenando al deudor al pago del capital que el acreedor recobre solamente de su deudor el setenticinco por ciento de dicho capital y el veinticinco por ciento restante sea adjudicado y recobrado por El Pueblo de Puerto Rico, quien podrá obtener mandamiento de ejecución, del mismo modo que el demandante, y sin preferencia sobre el montante adjudicado a éste, para hacer efectivo el veinticinco por ciento así adjudicado.''

La sección 4 de la ley de 1916 dispone que los derechos en ella definidos ''no son renunciables.''

La sección 1 de la ley de 1932 (Sesión extraordinaria de 1933, p. 27) lee ahora:

''Sección 1.—Que a falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cualquier clase de obligación o contrato, o con ocasión de un fallo o sentencia que no se haya cumplido, será de seis (6) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto; *Disponiéndose, sin embargo,* que no podrá fijarse un tipo de interés, por convenio especial, que sea mayor de nueve (9) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, cuando el capital objeto del préstamo o del convenio no exceda de $3,000, y de ocho (8) dólares anuales por cada cien (100) dólares, cuando pase dicha cantidad. Dentro de los límites que por esta ley se fijan, será legal descontar letras y pagarés y otras obligaciones análogas.''

Por lo menos en un caso, o sea en el de *McArthur* v. *Shenck,* 11 Am. Rep. 645, se ha dicho lo siguiente:

''Teóricamente, el prestatario ha sido colocado, a virtud de tales leyes, en la misma categoría de las personas incapaces de contratar, como por ejemplo, menores de edad, mujeres casadas, y personas dementes. Se le ha declarado legalmente incapaz para celebrar un contrato de dinero con intereses a un tipo mayor que el legal.''

Si la corte de Wisconsin estaba en lo cierto, entonces se desprende, por disposición expresa del artículo 1213 del Código Civil (Edición de 1930) que ''No hay contrato. . .''

Según el artículo 1206: "El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio." Un contrato que está taxativamente prohibido por el artículo 1 de la Ley de Usura, según la misma fué enmendada en 1933, y que de acuerdo con el contexto de la sección 4 de la referida ley, conforme fué enmendada en 1916, no puede hacerse efectivo en una corte de Puerto Rico, no obliga al deudor. En cuanto a éste, el contrato es nulo toda vez que no crea obligación alguna y, por consiguiente, no cumple con los requisitos de la definición estatutaria de un contrato. Los criterios expresados en el párrafo anterior son experimentales. No hemos pasado por alto el aparente conflicto de autoridades, pero no nos detendremos por ahora a practicar, a iniciativa propia y sin la ayuda de los letrados, una investigación de esta interesante cuestión. Véase, sin embargo, 13 Corpus Juris, 410, sección 339; 27 R. C. L. 242, 244, 245, secciones 45, 47, 48 y nota al caso de *Eskridge* v. *Thomas,* L. R. A., 1918 C., 769, 773, 775.

El artículo 110 del Reglamento para la ejecución de la Ley Hipotecaria lee, en parte, como sigue:

"Para distinguir las faltas subsanables de las que no lo sean . . . atenderá el registrador a la validez de la obligación consignada en el título. Si ésta fuese nula por su naturaleza, condiciones, calidad de las personas que la otorguen u otra causa semejante, independiente de su forma extrínseca, se considerará la falta como no subsanable. Si la obligación fuese válida, atendidas las circunstancias dichas, y el defecto estuviese tan sólo en la forma externa del documento que la contenga, y que se pueda reformar o extender de nuevo a voluntad de los interesados en la inscripción, se tendrá por subsanable la falta."

No importa lo que pueda decirse del defecto que ahora está bajo nuestra consideración, el mismo no es un mero defecto de forma del documento presentado al registro. Ese documento no puede ser "reformado o extendido de nuevo a voluntad de los interesados en la inscripción" en forma tal

que se elimine el factor aquí en disputa. De conformidad con los términos de la sección 4 de la ley de 1916, el prestatario está tan impedido de obligarse a sí mismo mediante una renuncia de su derecho estatutario, como lo estaba para comprometerse por la obligación original. En ninguna otra forma, a no ser mediante un nuevo contrato radicalmente distinto que estipule el pago de intereses al tipo permitido por la ley, o a un tipo inferior, podría el contrato original ser librado de su usura.

Si, conforme se sostiene en el contraalegato, el registrador carece de jurisdicción para impugnar la validez de un contrato usurario y debe inscribir el mismo, no obstante su naturaleza usuraria, entonces por la misma razón debe abstenerse de hacer referencia al hecho de que el contrato está viciado de usura. En otras palabras, en lo que a la cuestión de usura se refiere, está obligado a inscribir el documento sin mencionar ningún defecto subsanable. Un acreedor hipotecario poco escrupuloso tan sólo necesitaría entonces obtener un certificado del registrador de la propiedad e iniciar un procedimiento ejecutivo sumario para eliminar la defensa de usura, a menos que este tribunal esté preparado para resolver que el deudor hipotecario puede suscitar la cuestión de usura como defensa en tal procedimiento. Respecto a esta cuestión, véase el caso de *Cueto* v. *Corte de Distrito, etc.*, 37 D.P.R. 244.

Además, un cesionario del acreedor hipotecario podría invocar la protección ofrecida por el artículo 34 de la Ley Hipotecaria fundado en que la naturaleza usuraria del contrato no se desprendía claramente del Registro. Según hemos visto, la parte del contrato excluída de la inscripción efectuada, no especificaba el tipo de interés. Meramente dejaba en vigor en términos generales las disposiciones de un contrato ya existente. No es necesario que discutamos los méritos de la cuestión aquí sugerida. Sobrevendrían uno de dos resultados. Si este tribunal resolviera que el cesionario tiene derecho a la protección ofrecida por el artículo 34, entonces el derecho legal del prestatario sería eliminado

y hasta ese punto el estatuto se convertiría en letra muerta. Si, por otra parte, este tribunal resolviera que el cesionario tiene los mismos derechos que su cedente, no embargante las disposiciones del artículo 34, entonces el comprador inocente de una hipoteca inscrita perdería no solamente sus intereses sino también la cuarta parte del principal garantizado con dicha hipoteca. Mencionamos este aspecto del caso tan sólo para dar énfasis al hecho de que el registrador no es un interventor oficioso que trata de refrenar la codicia de un prestamista avaro ni un sentimentalista que acude en socorro de un prestatario que no está necesitado de ayuda y que tampoco la desea.

*Sin cerrar las puertas a ulterior discusión, debe confirmarse la nota recurrida.*

El Juez Asociado Sr. Córdova Dávila está conforme con el resultado.*

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SEÑOR WOLF

El artículo 18 de la Ley Hipotecaria dispone:

"Los Registradores calificarán bajo su responsabilidad la legalidad de las escrituras en cuya virtud se solicite la inscripción y la capacidad de los otorgantes por lo que resulte de las mismas escrituras.

"Del mismo modo calificarán, bajo su responsabilidad y para el único efecto de admitir, suspender o negar su inscripción o anotación, todos los documentos expedidos por la Autoridad judicial.

"Contra la suspensión o denegación de inscripción o anotación preventiva no se darán más recursos que los señalados en esta ley, sin que los Jueces o Tribunales puedan obligar en otra forma a los Registradores a que inscriban o anoten en virtud de documentos judiciales."

La cuestión aquí en controversia es si una escritura que estipula el pago de intereses calificados de usurarios por la ley es necesariamente ilegal. Sostengo que existen varias posibilidades que hacen que el contrato relativo al pago de

---

* NOTA: Véase el prefacio.

intereses envuelto en este caso pueda ser enteramente válido y exigible ante una corte de justicia.

Esto, aunque tiene su importancia, no es el punto principal de mi disentimiento, mas puedo decir de paso que si en realidad las partes contratantes antes del 16 de agosto de 1933, fecha en que fué enmendada la sección 1ª. de la ley sobre fijación de intereses, estipularon que el tipo de interés a ser pagado al renovarse el préstamo sería el 12 por ciento, una hipoteca para cubrir el préstamo a ese tipo sería enteramente válida entre las partes, aunque de la faz de la escritura se tratara de obtener un tipo de interés aparentemente ilegal. De igual modo, si el présamo se hace originalmente al 12 por ciento y el entendido entre las partes es que el préstamo devengará intereses al 12 por ciento hasta su definitivo pago, la prórroga de la hipoteca, o aun una nueva hipoteca, sería enteramente válida para garantizar la obligación original.

Entre las presunciones controvertibles halladas en nuestra Ley de Evidencia tenemos las siguientes (Estatutos Revisados de 1911, sección 1470):

"Art. 102.   .   .   .   .   .   .   .   .   .   .   .

"19. Que las transacciones privadas fueron realizadas con rectitud y en debida forma.

"   .   .   .   .   .   .   .   .   .   .   .   .

"32. Que la ley ha sido acatada."

Sin recurrir a ninguna presunción específica, debe excluirse la posibilidad de que no existía una obligación legal ni válida. Sostengo que no existe presunción en sentido contrario.

La hipoteca es siempre un contrato accesorio. Mi contención es que cuando cualquiera de las dos posibilidades existe, las partes tienen derecho a que se efectúe la inscripción y a que se les dé la oportunidad, de ser necesario, de demostrar que el contrato original era válido. Y si bajo una u otra de las anteriores suposiciones existe una obligación

válida, el contrato accesorio, es decir, la hipoteca, también será válido. Así pues, análogo al caso de *Compañía Azucarera de la Carolina* v. *Registrador,* 19 D.P.R. 152, ésa sería realmente una cuestión de hecho a determinarse.

El artículo 1228 del Código Civil (edición de 1930) presenta alguna analogía. Lee así:

"La expresión de una causa falsa en los contratos dará lugar a la nulidad, si no se probase que estaban fundados en otra verdadera y lícita."

Igualmente diremos de paso, para no dar demasiado énfasis al caso de la Carolina, supra, que si un contrato de su faz usurario es capaz de ser exigido mediante la renuncia o aquiescencia del deudor o de cualquiera de sus causahabientes, esta posibilidad o esta materialidad sería una cuestión de hecho. Sería una cuestión *in pais* si el deudor suscitara la cuestión de usura.

El registrador de la propiedad es en Puerto Rico un funcionario cuasi judicial, y en forma alguna es, o no es, un extraño al contrato celebrado entre las partes. El registrador está plenamente obligado a declarar que un contrato es ilegal si ésa es la realidad, y podría calificársele de extraño tan sólo en la misma forma que lo sería una corte de justicia. Cuando en una opinión uno dice que una persona es un extraño a un contrato, necesariamente se refiere a alguien, y no al registrador, que trata de obtener algún provecho o beneficio para sí al declararse ilegal un supuesto contrato usurario.

El punto principal para mí es que, con posibles excepciones que no son aplicables a este caso, el prestatario y ciertos bien reconocidos causahabientes, son las únicas personas que pueden obtener remedio alguno o insistir en la naturaleza usuraria de un contrato. *Berk et al.* v. *Isquitch Prod. Inc.,* 131 Atl. 526; *Hodges* v. *Westmoreland,* 8 Div. (Ala.) 551, 96 So. 573; *Dix* v. *Van Wyck,* 15 N. Y. Com. Law Rep. 522; *Pritchett* v. *Mitchell,* 17 Kan. 355, 22 Am. Rep.

287; *Billington* v. *Wagoner,* 33 N.Y.C.A. Rep. 33; *Williams* v. *Tilt,* 36 N.Y.C.A. Rep. 319 y casos allí citados en la página 326; 66 C. J. 314, 315; 27 R.C.L. 83.

No admito que el caso de *Williams* v. *Tilt* sea *obiter dictum,* pero aun si lo fuera, expone correctamente el estado. de la ley en Nueva York. Éste y los otros casos justifican la referencia que se hace a Corpus Juris y a Ruling Case Law, supra, estando estos últimos en armonía con mis propias ideas sobre el estado de la ley. Respecto a la objeción de que el caso de *Williams* v. *Tilt* es *obiter dictum,* puedo decir que toda vez que la persona que no tiene en absoluto relación o interés alguno en el contrato, de ordinario no instruirá un pleito gratuito (*gratuitous suit*) para que se deje el mismo sin efecto, se encontrarán muy pocos casos en que las cortes. digan que no puede oírse al demandante porque es un extraño al contrato. Por otra parte, se hallarán muchos casos en que si una persona tiene algún interés o presunto interés en que se declare nulo un contrato, o aun en casos en que esa persona tiene el derecho absoluto a anular un contrato, las cortes, *qua supra,* frecuentemente han establecido el principio de que un mero extraño al contrato no puede plantear. la cuestión.

Si bien algunas cortes sin que se les presente una alegación al efecto considerarán la cuestión de usura en favor de un deudor o su causahabiente, a mi juicio no puede hallarse ningún caso en que una corte la haya suscitado en beneficio de una persona ajena al contrato.

Aunque puede que haya casos que resuelvan lo contrario, en mi opinión la regla general es que los tribunales no permitirán al adquirente del título del deudor hipotecario (*equity of redemption*) que expresamente ha convenido en pagar la hipoteca y los intereses como parte del precio, que insista en que el contrato era ilegal por razón de su naturaleza usuraria. *Mathews, Ex.* v. *Ormerd et al.,* 140 Cal. 578; *Ferris* v. *Crawford,* 2 Den. 595; *Caldwell* v. *Commercial Bank,* 194 P. 899, 900. Véanse 27 Third Dec. Digest 523; 19

R.C.L. 300, sec. 74; 27 R.C.L. 288, sec. 89 et seq; véase nota Vol. 2 Am. & Eng. Ann. Cases 46.

Las cortes de equidad van aún más lejos, y en casos en que el deudor trata de obtener un remedio ante ellas, generalmente le exigen que pague el importe del préstamo principal. *De Wolf* v. *Johnson,* 10 Wheaton, 23 U. S. 367, 392; *Phila. & Sunbury R. R. Co.* v. *Lewis,* 75 Am. Dec. (Pa.) 574; 29 R.C.L. 265, sec. 67.

En ciertas jurisdicciones puede que haya alguna duda respecto a si las cortes protegerán o no al deudor, según he sugerido, aun contra su voluntad, pero me inclino a creer que en los estados en que se sigue tal práctica el estatuto declararía que un contrato usurario es totalmente nulo e inexistente. Ése era el estado de la ley en Puerto Rico a juzgar por la decisión de este tribunal en *Horton et al.* v. *Robert,* 11 D.P.R. 176.

En 1916 la Legislatura de Puerto Rico cambió la política del estatuto de usura y se expresó así:

"Sección 4.— .      .      .      .      .      .      .      .      .      .

" 'Ningún contrato en el cual se reserve, acepte o asegure, o se convenga en reservar, aceptar o asegurar, un tipo de interés mayor que el que se permite por esta Ley, podrá hacerse efectivo en una corte de Puerto Rico, sino por el importe del capital adeudado; y la corte deberá, además, disponer en la sentencia condenando al deudor al pago del capital que el acreedor recobre solamente de su deudor el setenticinco por ciento de dicho capital y que el veinticinco por ciento restante sea adjudicado y recobrado por El Pueblo de Puerto Rico, quien podrá obtener mandamiento de ejecución, del mismo modo que el demandante, y sin preferencia sobre el montante adjudicado a éste, para hacer efectivo el veinticinco por ciento así adjudicado.' " (Ley No. 47, de 1916.)

Existe amplia autoridad en los Estados Unidos al efecto de que la usura ha perdido su tinte de inmoralidad y los contratos usurarios son raras veces considerados como contrarios a la política pública y sí meramente contrarios al derecho positivo. *Lloyd* v. *Scott,* 29 U. S. (10 Peters) 205, 223; 21 A.L.R. 495; 27 R.C.L. 281.

Cuando el estatuto, conforme ocurre en Puerto Rico hoy en día, declara que un contrato de esta índole es nulo o no exigible, o usa frases similares, sin anular totalmente el contrato, las cortes según me parece, han dicho generalmente que el contrato tan sólo es anulable a instancias del deudor y sus causahabientes.

Aunque en campo distinto, el Estatuto de Fraudes usa palabras similarmente enfáticas y prohibe el otorgamiento de contratos verbales de cierta índole, pero las cortes casi siempre han resuelto que el privilegio otorgado por el Estatuto de Fraudes puede ser renunciado, y así lo hemos dicho en el caso de *De la Torre & Ramírez* v. *Bengoechea,* 48 D.P.R. 369.

Sostengo que cuando como en el presente caso la ilegalidad de un contrato depende de la voluntad del deudor, el registrador no tiene derecho a negarse a efectuar la inscripción.

Un punto de menor importancia es que, según lo entiendo, el contrato con sus intereses es indivisible, y que la cláusula relativa a intereses no debe ser segregada del cuerpo de la escritura, sino que debe dejarse a las partes que impugnen la validez del contrato al exigir su cumplimiento. El registrador no puede hacer otro contrato a nombre de las partes. No puede causarse daño alguno efectuándose la inscripción, toda vez que el deudor y sus causahabientes siempre están en libertad de suscitar la defensa de usura y no se perjudicaría a ningún tercero. La Ley Hipotecaria se ha hecho primordialmente para proteger a los terceros y no a las partes contratantes, quienes entre sí están sujetas a las mismas reglas de interpretación, inscríbase o no el contrato. El artículo 33 de la Ley Hipotecaria dispone:

"La inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes."

Debió haberse revocado la nota recurrida y haberse inscrito todo el contrato.